# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 50373 | **DATE** | 8/15/2002 |
| **CASE TITLE** | SORENSON vs. BARNHART | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] As stated in the attached Memorandum Opinion and Order, Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted. Enter attached Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | AUG 20 2002 | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 8/15/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| tml | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 02 AUG 19 AM 10:16 FILED-WD Date/time received in central Clerk's Office | ss mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| Tiffany A. Sorenson, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 01 C 50373 |
| | ) | |
| v. | ) | Philip G. Reinhard |
| | ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, (Plaintiff), seeks judicial review of the final decision of the Commissioner of the

Social Security Administration (Commissioner). See 42 U.S.C. §§ 405(g), 1383(c)(3). The

Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits (DIB)

pursuant to Title XVI of the Social Security Act (the Act). 42 U.S.C. §1381(a). This matter is

before the Magistrate Judge pursuant to consents filed by both parties on January 17, 2002. See 28

U.S.C. § 636(c); Fed. R. Civ. P. 73.


## I.      BACKGROUND

Plaintiff first filed for DIB on December 15, 1997, alleging an inability to work since March

26, 1997, due to pain in the lumbar region of her lower back arising from a herniated disc at L5-S1.

(Tr. 47, 48, 72). Plaintiff's application for benefits was initially denied on July 17, 1998. (Tr. 49 -

52). On July 24, 1998, Plaintiff filed a request for reconsideration. (Tr. 53). Plaintiff's request for

reconsideration was denied on October 19, 1998. (Tr. 54 - 56). Plaintiff then filed a request for a

hearing before an Administrative Law Judge (ALJ) on December 9, 1998. (Tr. 57). Plaintiff appeared, with counsel, before an ALJ on September 17, 1999. (Tr. 23 - 46). In a decision dated May 31, 2000, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 12 - 18). On June 16, 2000, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 6). On September 11, 2001, the Appeals Council denied Plaintiff's request for review. (Tr. 4 - 5).

## II.  FACTS

Plaintiff was born on June 15, 1974, and at the time of the hearing she was a twenty-five year old high school graduate who had never been married and had no children. (Tr. 28, 29). One month prior to the hearing, Plaintiff moved to her own apartment, which was the first time she had lived by herself in her entire life. (Tr. 28). Plaintiff testified that she was five feet six and one-half inches in height and weighed between 315 and 320 pounds. (Tr. 29). Plaintiff stated that the majority of her work experience was as a CNA in group homes for mentally disabled adults and children. (Tr. 30). The majority of her job tasks included physically lifting or restraining people, vacuuming, sweeping, and mopping. (Tr. 32).

Plaintiff had back surgery on November 19, 1998. (Tr. 33). After the surgery, Plaintiff did not experience extreme back pain for several months. (Tr. 198-99). Plaintiff testified that the pain in her back recurred one morning and that she could not get out of bed. (Tr. 38). Since that instance Plaintiff experienced an equal amount of good and bad days during any given week. (Tr. 38). She testified that the pain in her back has been about the same as before the surgery. (Tr. 33). Plaintiff claimed that she experienced pain if she sat or stood for too long, she could not lie flat on her back because she would never be able to get up, and she was not able to sleep at night without taking pain

2

medication. (Tr. 38). Plaintiff stated that most of her days are spent at home either sitting, standing or lying down. (Tr. 36). She stated she can stand for five to ten minutes before she has to sit down; she can sit for five to ten minutes before she needs to get up; she cannot walk an entire street block; she cannot lift anything weighing more than 25 pounds; and she cannot bend over and get back up without holding on to something. (Tr. 34, 35).

Plaintiff currently takes Flexeril, Darvocet, Advil and Aleve to relieve pain and discomfort. (Tr. 40). Plaintiff stated she was prescribed to take Flexril three times per day and two Dorovocet tablets every four to six hours for her pain. She commented that she takes Advil and Aleve whenever she needs to be alert because the other medications make her tired. (*Id.*). Plaintiff indicated that she probably takes two to three over the counter drugs per day, and that she has not engaged in physical therapy since after the surgery. (*Id.*).

Plaintiff testified that she does not go shopping because she has to sit down constantly, but conceded that she is capable of going into the grocery store to buy something. (Tr. 36). Plaintiff stated that even though she moved out on her own and is able to cook for herself, she remains dependent on family members to clean her house and do her laundry. (Tr. 36, 37). She commented that she can go over to her friend's house to visit, but is not able to dance, bowl, or go horseback riding, as she has in the past. (Tr. 37).

Plaintiff also testified that after her surgery she began working at Stryve, Inc. in January 1999, but had to quit her job there after two weeks because she could not climb the stairs or do the amount of walking the job required. (Tr. 31, 200). Plaintiff stated that upon quitting her job at Stryve, her doctor told her she needed to stop working. (Tr. 31). She went back to work for Stryve in May 1999, until August1999, when she quit because she was moved to a different facility where

she was expected to complete strenuous job tasks such as vacuuming and mopping. (Tr. 32). Plaintiff testified that her decision to quit was also based on advice from her doctor's nurse not to do vacuuming or mopping. (*Id.*).

At the hearing a Vocational Expert was asked to give his opinion about jobs that can be done by someone between 22-25 years old with a high school education, and a CNA license, who can lift up to twenty pounds occasionally and ten pounds frequently, must change position every hour, can occasionally bend, should avoid twisting and should not perform push/pull activities. (Tr. 44). The Vocational Expert testified that such an individual can perform semi-skilled jobs such as: general receptionist with 8,500 positions listed; information clerk with 5,500 jobs listed; and ticket clerk with 9,000 positions listed. (Tr. 44 - 45). The Vocational Expert testified that a person could not do any of these jobs if they could only maintain a position for fifteen minutes. (Tr. 45).

III.    **MEDICAL HISTORY**

Plaintiff injured her back while working as a home care manager at Rural Health Systems in LaGrange, Texas on March 26, 1997. (Tr. 125). She was seen by Dr. Pugh in Austin, Texas on two occasions. (Tr. 125). Dr. Pugh diagnosed Plaintiff with low back strain. (Tr. 125). He gave her a Cortisone shot and prescribed her Flexril, Relafen and Vicodin. (Tr. 125). Plaintiff ended her job a week after her injury and subsequently moved back to Rockton, Illinois. (Tr. 135).

After moving back to Illinois, Plaintiff was seen on April 11, 1997, by Dr. LaRoque at Mercy Beloit Medical Center because of the continuing pain in her lower back and the mild pain radiating in her left posterior thigh accompanied by a tingling sensation. (Tr. 125). Dr. LaRoque commented that Plaintiff's back was difficult to assess due to Plaintiff's obesity. (Tr. 125). He diagnosed

4

Plaintiff with low back strain and recommended physical therapy three times per week for three weeks; continuation of use of Relafen and Flexeril; and warm soaks four times per day.

On April 28, 1997, Dr. LaRoque ascertained that there was no change in Plaintiff's condition. (Tr. 121). Plaintiff saw Dr. LaRoque again on May 12, 1997, at which time she complained that the physical therapy exercises only worked temporarily and she continued to have back pain. (Tr. 119). Dr. LaRoque assessed that Plaintiff walked with a slight limp and complained of pain in her left buttocks, although she could do heel to toe walking normally, nearly do a full squat, and flex her back to approximately sixty degrees. (Tr. 119). After taking an MRI of Plaintiff's lumbar spine, Dr. LaRoque diagnosed Plaintiff with a disc herniation that displaced a nerve root. (Tr. 153).

On July 2, 1997, Plaintiff was admitted to the hospital for strict bed rest, pelvic traction, and neurologic evaluation by Dr. Lanser. (Tr. 135). A physcial examination revealed tenderness in Plaintiff's left sacroiliac; straight leg raises that were negative bilaterally; normal strength in her upper and lower extremities; normal sensation and reflexes; and she retained the ability to walk on heels and toes. (Tr. 136). Dr. Lanser diagnosed Plaintiff with left radiculopathy due to disc bulge. (Tr. 137). He commented that Plaintiff's obesity created complications that might hinder conservative management and place a great risk for failure on any attempts at surgery to relieve Plaintiff of her symptoms. (Tr. 137). Dr. Lanser recommended that EMG nerve condition studies be performed on her left leg, that she continue using pelvic traction, that she remain on the anti-inflammatory medication and muscle relaxers she had been taking, and that she continue using her current methods to lose weight. (Tr. 137).

After being discharged from the hospital, Plaintiff continued to experience back pain. She returned to Mercy Clinic at least once a week to have her back reexamined. (Tr. 181). An

examination on August 18, 1997, showed no abnormalities, no bone defects and no arthritic features. (Tr. 180).

On September 25, 1997, Plaintiff saw Dr. Fuiks, a neurosurgeon, because she was not able to walk two or three blocks without stopping due to pain and cramping in the back of her left thigh. (Tr. 176). Dr. Fuiks' evaluation showed Plaintiff was able to walk erect without assuming a posture or gait that avoided or lessened pain. (Tr. 176). His clinical impression was that Plaintiff unmistakably had a lumbar herniated disc with symptoms of radiculopathy. (Tr. 177). Dr. Fuiks felt surgical decompression was a reasonable option, although her weight and the fact that she had more back symptoms than leg symptoms placed her at a greater risk for either recurrence or a less than optimal surgical result. (Tr. 177).

In April 1998, Plaintiff saw Dr. Ramchandani because her she had a sharp pain in the lumbar spine with tingling and numbness going down her left lower extremity on the inside of her thigh. (Tr. 146). Plaintiff reported that the pain was worse when she sat for ten minutes, stood for five to ten minutes, lifted anything twenty-five pounds, or walked half a block. (*Id.*). Upon physical examination Plaintiff was able to get on and off the examination table without assistance. (Tr. 146). She exhibited a normal, unassisted gait, ability to squat and rise up with support, ability to walk on heels and toes, get on and off the examination table without difficulty, and the ability to dress and undress without assistance. (*Id.*). Examination of her lumbar spine revealed no soft tissue swelling or inflammation. (Tr. 147).

On May 1, 1998, an MRI of Plaintiff's lumbar spine suggested disc herniation and degenerative disc disease. (Tr. 152). On May 29, 1998, Plaintiff was admitted to the hospital for severe low back pain radiating to her lower leg and disc herniation. (Tr. 155). A MRI was done on

6

May 30, 1998, which revealed no marked change in Plaintiff since her May 1, 1998, MRI. (Tr. 157). On June 1, 1998, Plaintiff was seen by Dr. Fuiks. (Tr. 159). Dr. Fuiks noted that Plaintiff's most recent MRI study resulted in a less impressive herniated disc, although there was still some damage to the nerve root. (Tr. 159). Dr. Fuiks noted that even though Plaintiff did not seem to be healing, he did not feel Plaintiff was getting progressively worse over time. (Tr. 159). He also mentioned that Plaintiff's weight and her motivation to get well were factors to consider before performing surgery. (Tr. 159).

Plaintiff was given a preoperative evaluation for possible diskectomy because of her continued back pain by Dr. Juan on May 30, 1998. (Tr. 161). Significant symptoms identified by Dr. Juan were low back pain associated with shooting pain down the left leg and numbness in the left leg. (*Id.*). His physical examination of Plaintiff revealed tenderness over the lumbosacral area and onto the left paraspinal area, but good muscle tone, strength, normal reflexes and intact sensations. (Tr. 162). He suggested Plaintiff continue conservative treatment with the use of pelvic traction, muscle relaxers, and pain medication. (Tr. 163).

On November 19, 1998, Dr. Thomas performed surgery on Plaintiff for herniated intervertebral disc at the L5-S1 level on the left. (Tr. 195). Dr. Thomas commented that Plaintiff tolerated the procedure well. (*Id.*). Plaintiff reported that she was doing well, although she experienced some pain in her right hip six days after the surgery. On December 8, 1998, Plaintiff reported she felt better every day. (Tr. 198). In September 1999, Plaintiff complained of increased pain in her lower back with pain radiating to her lower left leg and difficulty sleeping. (Tr. 206). Examination showed evidence of lower lumbar surgery and a MRI of her lumbar spine showed no suggestion of recurrent disc herniation. (Tr. 205).

7

State Agency medical reviewers completed a capacity assessment for Plaintiff in May 1998. They noted that Plaintiff can occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of two hours in an 8 hour work-day; sit for a total of about 6 hour work-day; should limit pushing and/or pulling in lower extremities and should not operate foot controls. (Tr. 185). They also reported that Plaintiff can occasionally engage in climbing, balancing, stooping, kneeling, crouching, crawling; and that Plaintiff exhibited no manipulative, visual, communicative, or environmental limitations. (Tr. 186-88).

## IV.     STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."

*Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F.Supp. 1377, 1384 (N.D.Ill. 1995).


## V.   FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological

9

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[1] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[2] A severe impairment is one which significantly limits the claimant's physical or

---

[1]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

[2]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found

11

not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.  **ANALYSIS**

The court will proceed through the five step analysis in order.

A.  Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on May 31, 2000. (Tr. 18).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b)(2) Table 1, as modified by 65 FR 82905, December 29, 2000). In this case, the Plaintiff returned to work on two brief occasions, each lasting less than three

12

months and ending due to Plaintiff's impairments. (Tr. 13). Therefore, the ALJ reasonably disregarded these periods of work as "unsuccessful work attempts". (Tr. 13).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from medically determinable, severe impairments. Specifically, the ALJ found that medical evidence supported Plaintiff's claim that she suffered from degenerative disc disease of the lumbosacral spine and morbid obesity. (Tr. 17).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.    Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 13). The ALJ found that Plaintiff's back impairment, whether considered alone or in combination with obesity, does not meet the requisite "motor, reflex and sensory loss" to satisfy any section of the Listings. (Tr. 13).

Plaintiff contends that the ALJ erred in not finding she was disabled at any time through the date of the decision. (Pl.'s Mem. at 6). Plaintiff argues that the ALJ failed to consider the obesity

impairment either alone, or in combination with her other impairments. (Pl.'s Mem. at 6). Initially, Plaintiff urged the court to consider the fact that her claim was pending prior to the deletion of Listing 9.09; hence, the ALJ should consider granting her a closed period of disability. (Pl.'s Mem. at 6). The ALJ noted that Listing 9.09, for obesity, was deleted as of October 1999. (Tr. 13). However, after further research, Plaintiff conceded that Listing 9.09 does not apply and asked the court to consider her claim based on the new ruling on obesity (SSR 00-3p). (Pl.'s Mem. at 8).

The Social Security Ruling 00-3p, No. 7 (C.E. 2000), provides that "because there is no listing for obesity, ... an individual with obesity 'meets' the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing," or it shall be determined that "a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing." The Plaintiff argues that the "degenerative changes" in her spine constitute a "component of arthritis" and, therefore, comply with the requirements of a Listing. (Tr. 25).

In determining that Plaintiff's impairments did not meet the requirements of a Listing individually or in combination, the ALJ looked at the musculoskeletal category of impairments, specifically noting Section 1.05 *Disorders of the spine*. (*See* 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1). Section 1.05 A of the regulations provide that "[a]rthritis [is] manifested by ankylosis or fixation of the cervical or dorsolumbar spine at 30° or more of a flexion measured from the neutral position, with X-ray evidence of: 1. Calcification of the anterior and lateral ligaments; or 2. Bilateral ankylosis of the sacroiliac joints with abnormal apophyseal articulations." (20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1). Sections B and C of the Listing include osteoporosis and other vertebrogenic disorders, none of which are satisfied by Plaintiff's impairments. *Id.* The ALJ found that despite severe impairments of degenerative disc disease and morbid obesity, Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 13, 17).

Evidence exists to support the ALJ's conclusion that objective findings in this case fail to provide strong support for Plaintiff's claims of disabling symptoms and limitations. (Tr. 14). When allegations of pain are not supported by the objective medical evidence in the record and the Plaintiff indicates pain is a significant factor of her inability to work, then the ALJ must consider the nature and intensity of the pain, the precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and daily activities. *Zurawski v. Halter*, 245 F.3d 881, 691 (7th Cir. 2001).

To support her decision to deny benefits, the ALJ relied on evidence that seemingly contradicts Plaintiff's complaints of disabling pain. For instance, Drs. Lanser, Fuiks, and Ramchandani noted Plaintiff did not walk as if she was trying to lessen or reduce any pain; they noted she was able to do heel and toe walks and full squats; and they also noted that she was able to flex her back to about 60°. (Tr. 119, 136, 146). Despite Plaintiff's complaints of the inability to lie flat on her back, sit, stand, bend, or twist, she was able to dress and undress and get on and off the examination table without assistance during physical examinations. (Tr. 147). The ALJ also noted that Plaintiff lives by herself and testified that she can bathe, go to the grocery store, cook, and drive without any problems. (Tr. 14). Even though Plaintiff complained to Dr. Fuiks of having an increased amount of symptoms, he commented that her MRI study demonstrated a less impressive herniated nucleus pulposis. (Tr. 159). As a result, Dr. Fuiks questioned Plaintiff's motivation to get well. (Tr. 159). In addition, Plaintiff's obesity was noted by treating physicians as a complicating matter when considering the likelihood of successful back surgery, but it was never mentioned in treatment notes as a limitation on Plaintiff's ability to function. (Tr. 137, 147, 163).

In considering the subjective evidence provided at the hearing, the ALJ noted that Plaintiff's September 1999, MRI study displayed no evidence of disc herniation. (Tr. 16). He also considered Plaintiff's complaints of disabling pain, which were unsupported by any evidence that she attempted to manage her pain with the use of nerve blocks or physical therapy since her surgery. (Tr. 16). By

15

Plaintiff's own admission, the ALJ found her only attempt to manage the pain was through prescribed pain relievers and minimal use of over the counter medications. (Tr. 40-1). The ALJ also noted that Plaintiff failed to provide any evidence to support her claim that she could only sit or stand for five to ten minutes without experiencing significant pain. (Tr. 14). Furthermore the ALJ commented that Plaintiff failed to obtain any opinions from physicians indicating she was disabled or had extreme physical limitations. (Tr. 14). The physicians' notes from both before and after the November 1998, surgery do not suggest any limitations greater than those found by the ALJ. (Tr. 15).

The ALJ considered the evidence in the record, followed the sequential evaluation process and reasonably found that Plaintiff was not disabled at any time through the date of his decision. Given the lack of objective support and the absence of any physician opinion to the contrary, substantial evidence exists to support the ALJ's finding and this court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.     Step Four:  Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of her past relevant work. The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed. (Tr. 16).

E.     Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five the ALJ determined that although Plaintiff's Residual Functional Capacity (RFC) did not allow her to perform the full range of light work, there exist a significant number of jobs in the national economy that she can perform. (Tr. 16).

In determining a physical RFC, the first step in the procedure is to assess the nature and extent of the claimant's physical limitations. (20 C.F.R. § 416.945 (b)). This information is then used to determine the physcial RFC for work activity on a regular and continuing basis. In order to properly assess an individual's level of functioning due to a physical limitation, evaluation of the impairment must take into account the severity of the impairment over a period of time. (20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1 12.00 (d)). This information is then used to complete claimant's vocational assessment.

In assessing the nature and extent of Plaintiff's limitations, the ALJ found that Plaintiff's impairments preclude her from lifting more than 20 pounds occasionally and 10 pounds frequently; performing any job that does not allow her to change position every hour; bending more than occasionally; twisting her trunk, or performing push/pull activities. (Tr. 13). Taking into account Plaintiff's impairments, the ALJ determined her obesity and lumbar pain impose such "functional restrictions" as to limit her ability to perform the full range of light work such as sitting most of the time, with some pushing and pulling of arm or leg controls, or a high volume of walking or standing. (Tr. 16, *see generally* 20 CFR Ch. III, Section 404.1567 (b)). Therefore the ALJ was precluded from directly applying rule 202.21 of the Medical - Vocational Guidelines, Appendix 2, Subpart P, Regulations No. 4, which would direct a finding that Plaintiff is "not disabled." (Tr. 15).

After careful review of the record, the ALJ did not find Plaintiff's claim to be credible to the extent it suggested she could not perform light or "even sedentary" work. (Tr. 15). He also noted that there was little if any medical evidence to support Plaintiff's claim of disability. (Tr. 16). As a result, the ALJ determined from the VE's testimony that there are 28,000 jobs in the national economy a person of Plaintiff's age, education, experience and RFC could perform. (Tr. 16-17). Even though the VE reported Plaintiff could not do any of these jobs if she could only maintain a position for fifteen minutes, a substantial amount of the evidence supported findings contrary to the Plaintiff's claims of only being able to sit or stand for five to ten minutes. (Tr. 16). In reliance on

the VE's testimony as well as the state's medical assessment, the ALJ concluded that Plaintiff can reasonably be expected to make a vocational adjustment to work that exists in significant numbers in the national economy. (Tr. 17). Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Five of the Analysis is affirmed.

## VII.   <u>CONCLUSION</u>

For the reasons stated above, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's motion for summary judgment to the administrative record and pleadings is denied and summary judgment is granted to Defendant.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 8/15/02